UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE BOARD OF EDUCATION OF
THE COUNTY OF NICHOLAS,

   Plaintiff,

v.            Case No. 2:09-cv-001318

H.A., a minor, MONICA A.,
Parent of H.A.,

   Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

   This civil action is assigned to the Honorable John T. Copenhaver, Jr., Judge of the United States District Court for the Southern District of West Virginia, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

   This action, filed by the Board of Education of Nicholas County, West Virginia ("LEA"), challenges the decision of a due process hearing officer who found that LEA had not followed the decision of a previous hearing officer.  LEA further alleges that the current hearing officer improperly placed the burden of proof at the administrative hearing on LEA, rather than the parent, in contravention of the recent decision of the Supreme Court in Schaffer v. Weast, 546 U.S. 49, 56-62 (2005).  LEA asks that the current hearing officer's decision be overturned, Defendants ask

that it be affirmed.

**Pending Motions**

Currently pending before the court is Plaintiff's Motion for Summary Judgment. (Docket # 12.) On March 18, 2010, LEA filed the administrative record in this matter. (# 11.) On July 16, 2010, Defendants responded (# 17), and on August 20, 2010, LEA replied (# 18), making the matter ripe for decision.

On December 2, 2010, defendant Monica A. filed a Motion for Temporary Injunction, seeking an order staying the current Individualized Education Plan ("IEP") of her minor child, H.A., and halting any IEP meetings until further order from this court. (# 20.) The court entered a briefing schedule, and instructed that it would enter proposed findings and recommendation, but was not authorized to issue a temporary injunction. Accordingly, the court instructed that the IEP meeting scheduled on December 6, 2010, would go forward and that pending a ruling from the presiding District Judge, H.A.'s IEP would not materially change. (# 21.) Plaintiff responded on December 9, 2010. (# 23.) Defendant Monica A. did not reply.

**Allegations in the Complaint**

In the Complaint, LEA alleges that H.A., a student attending Panther Creek Elementary School in Nicholas County, West Virginia, is a child with disabilities within the meaning of the Individuals with Disabilities Education Act of 2004, 20 U.S.C. § 1400 et seq.

2

("IDEA"). (# 1, ¶¶ 4-5.) On or about July 14, 2009, Monica A., the parent of H.A., filed a due process complaint against LEA pursuant to 20 U.S.C. § 1415 alleging that LEA failed to offer H.A. a free appropriate public education ("FAPE"). (# 1, ¶ 6.) On October 22, 2009, a due process hearing officer issued a decision requiring LEA to pay for an independent comprehensive psycho-educational evaluation, including a behavior assessment and social skills component by a licensed clinical or school psychologist or psychiatrist chosen by the parent; to pay for an independent speech/language communication evaluation of H.A. by a licensed speech pathologist chosen by the parent; and to provide H.A. with two hours per week of compensatory education and related services in the areas of social/communication/behavior needs for a period of eleven months in addition to the original fifteen months which were ordered by a prior hearing officer. (# 1, ¶ 7.) LEA alleges that the hearing officer erred in making the above findings and in awarding the relief outlined above. (# 1, ¶¶ 8-25.)

LEA asks that the court (1) review the administrative proceedings; (2) enter judgment in its favor; (3) enter an order reversing the decision of the hearing officer; (4) order that the student does not need further evaluation or compensatory education in the areas of social/communication/behavior needs; and (5) order that H.A.'s IEP be implemented in accordance with LEA's proposed program. (# 1, p. 6.)

3

In answer to the Complaint, Defendants assert that (1) the burden of proof rests with LEA; (2) LEA did not make certain witnesses available at the due process hearing; and (3) LEA denied H.A. FAPE. (# 5, pp. 2-8.) Defendants ask that the court (1) review the administrative proceedings; (2) uphold the decision of the hearing officer; and (3) order LEA to pay any and all costs of Defendants associated with this appeal. (# 5, p. 8.)

**Arguments of the Parties**

In the memorandum in support of LEA's Motion for Summary Judgment, LEA argues that the burden of proof was erroneously placed on LEA through misinterpretation of Policy 2419 and in the face of Schaffer v. Weast, 546 U.S. 49 (2005), a Supreme Court decision to the contrary. (# 13, pp. 9-11.) LEA argues that even if the language of Policy 2419 justifies a conclusion that the burden should have been placed on LEA, Policy 2419 is preempted by IDEA and the Supreme Court's interpretation of the burden of proof under the statute. (# 13, pp. 11-12.)

In addition, LEA argues that it complied with the hearing officer's November 17, 2007, decision requiring it to provide an independent evaluation. (# 13, pp. 12-13.) Because LEA did not bear the burden of proof in this matter, it was not required to call Dr. Krieg, who performed the evaluation, to offer evidence at the administrative hearing that the report was appropriate. (# 13, p. 13.) In addition, LEA argues that the hearing officer's conclusion

4

that it had a propensity to discredit a diagnosis with which it disagreed and to seek out a diagnosis with which it agreed, "is unsupported by any evidence in the record ... [and] incongruous for the [hearing officer] to conclude on one hand that the LEA failed to comply with the mandate that it cooperate to secure an independent comprehensive psychoeducational evaluation (and by implication consider the report's substance), and fault the LEA for considering the findings and recommendations contained in the independent comprehensive psycho-educational report on the other." (# 13, pp. 13-14.) Finally, LEA points out that on April 24, 2008, the West Virginia Department of Education, Office of Assessment and Accountability deemed LEA compliant with the prior hearing officer's decision of November 14, 2007. (# 13, p. 14.)

Finally, LEA argues that it did not deny H.A. FAPE, as it modified the IEP to meet the student's behavioral, social and communication needs, if any. LEA points out that it modified the IEP after further observing and monitoring of H.A. to address H.A.'s behavioral, social and communication needs, even though such needs were called into question by several of H.A.'s closest teachers and administrators. (# 13, pp. 14-15.) Thus, because no material fact remains, LEA asserts that it is entitled to summary judgment. (# 13, p. 16.)

In response, Defendants argue that the hearing officer properly placed the burden of proof on LEA. Defendants assert that the

5

<u>Schaffer</u> decision only affected states that did not already have a policy in place regarding the burden of proof.   Because West Virginia already has such a policy, West Virginia is unaffected by this decision.  (# 17, p. 4.)

Defendants further assert that the evaluation by Dr. Krieg was not a fair evaluation as ordered by the hearing officer and that the parent was "unable to come up with three evaluators that the school would agree to choose from, as a matter of default Mr. Fred Krieg was chosen to do the evaluation.   Mr. Krieg had an undisclosed relationship with school personnel." (# 17, p. 3.)  Dr. Krieg also violated the hearing officer's decision in which he directed that the evaluation should emphasize H.A.'s educational needs and not the label of her condition.  Defendants point out that Dr. Krieg placed "a lot of emphasis on his opinion of the label for her condition on page 7 and also on the majority of page 22, thus violating the" hearing officer's decision.  (# 17, p. 3.)

Defendants offer new evidence into the record, including a complaint against Dr. Krieg made to the West Virginia Board of Psychologists by Defendants and a notice of hearing dated September 16, 2010, related to the complaint.   (# 17, p. 3.)

Finally, regarding the social skills evaluation, Defendants assert that LEA did not conduct evaluations using outside evaluators or during the summer program.  (# 17, p. 4.)  Defendants argue that although LEA eventually gave H.A. a behavior plan, they delayed this

behavior plan for an additional eleven months after the hearing officer's decision, thus causing H.A. to lose additional educational benefit.  (# 17, pp. 4-5.)  Defendants request that the court issue summary judgment in their favor and uphold the hearing officer's decision.  (# 17, p. 6.)

In reply, LEA takes issue with Defendants' reliance on evidence from the prior due process decision, arguing that it has limited relevance to the time period relevant to the present appeal.  (# 18, p. 1.)  Regarding Dr. Krieg, LEA asserts that it fully complied with the hearing officer's decision in identifying Dr. Krieg to perform the evaluation that was required, and there is no evidence that he engaged in any improprieties.  LEA contends that "[t]he fact that Defendant is pursuing a complaint against Dr. Krieg does not warrant a finding that Plaintiff's conduct may be questioned or that the educational program for the Student failed to provide educational benefit."  (# 18, p. 2.)

**Findings of Fact**

The court proposes that the presiding District Judge make the following findings of fact:

**A.   Pertinent Medical Evidence before first Hearing Officer**.

1.   Crystal M. Knight, M.A., supervised psychologist, and Michael D. Morrello, M.S., psychologist - On May 4, 2006, Ms. Knight and Mr. Morrello evaluated H.A. for the possibility of Autism.  They administered the Gilliam Autism Rating Scale ("GARS"), conducted

other testing and diagnosed Autism.  (# 11-6, pp. 22-26.)

2.  Lex de Gruyl, NCSP - On July 7, 2006, Mr. de Gruyl, a
licensed psychologist, conducted a psycho-educational evaluation to
determine H.A.'s current levels of cognitive and academic
functioning at the request of LEA.  He noted that a previous
evaluator had administered the GARS and, on the basis of her average
score on this instrument, was diagnosed with Autism.  (# 11-6, p.
18.)  During testing, H.A. would begin tasks with little hesitation
until the task became more difficult, but she became easily
frustrated and needed excessive prompting in order to continue.
(11-6, p. 19.)  "At times, standardized test procedures needed to be
altered to elicit responses that this examiner was fairly sure of
her ability to answer correctly.  Several subtests were unable to be
administered due to [H.A.'s] lack of cooperation." (# 11-6, p. 19.)
H.A. functioned in the low average range of cognitive ability
compared to other children her age. Mr. de Gruyl was paid $250.00
for this assessment.  (# 11-3, p. 49.)

3. George Damous, M.A., Ed.S. - Mr. Damous examined H.A. on
October 30, 2006, to assess the nature and extent of her academic
and behavioral difficulties.  The results showed average academic
abilities in math and below average abilities in reading and
language.  Overall intellectual functioning was reflected in the
borderline range with low average nonverbal skills.  Mr. Damous
recommended that an adaptive behavior assessment be completed to

assist in determining H.A.'s current functioning levels. (#11-6, p. 16.) Mr. Damous was paid $400.00 for this evaluation. (11-3, p. 50.)

4. Susannah Grimm Poe, Ed.D. - On November 8, 2006, Dr. Poe and others examined H.A. and opined that she did not meet the criteria for any diagnosis on the autism spectrum. (# 11-6, p. 12.)

5. William D. Hagerty, M.A. - On August 2, 2007, Mr. Hagerty examined H.A. at the request of Monica A. H.A. was delayed in all areas of adaptive behavior, including communication, age appropriate self-help skills, motor skills, and socialization skills. (# 11-3, p. 21.) Mr. Hagerty diagnosed Asperger's Syndrome on Axis I and made no Axis II diagnosis. Mr. Hagerty recommended special education.

6. Toni B. Goodykoontz, M.D. - On September 13, 2007, Toni B. Goodykoontz, M.D. examined H.A. and opined that H.A. had an Autism Spectrum Disorder, most likely Pervasive Development Disorder, not otherwise specified or Asperger's Disorder. Dr. Goodykoontz recommended that "the school assist in modifications to meet her education needs." (# 11-3, p. 26.) He recommended occupational therapy.

B. **Previous Hearing Decision dated November 14, 2007, Docket # D08-003.**

The first hearing decision, issued by Hearing Officer James Gerl on November 14, 2007, included the following pertinent

background facts and findings:

1.  H.A. was born on June 28, 2000, and began kindergarten in the 2005-06 school year.  (# 11-1, pp. 57-58.)

2.  H.A. encountered learning and behavior problems.  (#11-1, pp. 58-59.)

3.  On September 18, 2006, H.A. was deemed eligible for an IEP because she met the criteria for the speech/language area of exceptionality.  (# 11-1, p. 62.)

4.  Immediately thereafter, the IEP team met and recommended that H.A. receive speech therapy.  The speech therapist had prepared a draft IEP prior to the meeting, and no changes were made to the draft.  Monica A. requested one-on-one teaching and program modification as recommended by the SAT team, but the school personnel refused.  (# 11-1, p. 63.)

5.  On October 25, 2006, the schools evaluated H.A. for occupational therapy, but found that she did not qualify for occupational therapy services.  (# 11-1, p. 64.)

6.  Monica A. requested an independent psychological evaluation, which took place on October 31 [sic 30], 2006, at the school's expense.  It found that Claimant had below-average abilities in reading and language and recommended an adaptive behavior assessment be conducted.  (# 11-1, p. 64.)

7.  On November 8, 2006, H.A. was evaluated at a neurodevelopmental center, and the evaluators found that while H.A.

did not meet the criteria for a diagnosis on the autism spectrum, they recommended that H.A. continue to work with a psychologist on social and developmental issues.  (# 11-1, p. 65.)

8.   On January 19, 2007, the school convened an eligibility meeting and found that H.A. was eligible for speech services only. (# 11-1, p. 65.)

9.   On February 16, 2007, the schools convened an IEP team meeting and although no formal IEP was produced, the memorandum of this meeting reflects that speech/language therapy would be continued, but that H.A. was not eligible for occupational therapy and there would be no changes to the student's IEP.  (# 11-1, pp. 65-66.)

10.   H.A. repeated kindergarten in 2006-07 and, after H.A. completed this second year, her mother received a report card indicating that H.A. had difficulty taking turns and being around others, that she needs to work on sharing and being more independent, and that she needs to do less talking, whistling and singing.  She failed to master nineteen of approximately forty-six items measured, including all of the subcategories under vocabulary and fine and gross motor skills.  (# 11-1, p. 66.)

11.   On August 2, 2007, H.A. was evaluated by another psychologist, Mr. Hagerty, who found that she was delayed in the areas of behavior, including communication, age-appropriate self-help skills, motor skills and social skills.  The evaluator found an

11

IQ of 105.  He diagnosed Asperger's syndrome and recommended special education and a behavior support plan.  The schools did not receive this document until after the due process hearing complaint had been filed.  (# 11-1, pp. 66-67.)

12.  On August 27, 2007, H.A.'s physician issued a letter noting the recent diagnosis of Asperger's and recommending special education services.  The schools did not receive this document until after the due process hearing complaint had been filed.  (# 11-1, p. 67.)

13.  On September 13, 2007, a pediatric psychiatrist evaluated H.A. and diagnosed Pervasive Developmental Disorder, not otherwise specified.  The schools did not receive this document until after the due process hearing complaint had been filed.  (# 11-1, p. 67.)

14.  Hearing Officer Gerl determined that the schools violated IDEA, both procedurally and substantively, by (1) rejecting the evaluation of a supervised psychologist that the student suffered from autism and, the resulting IEP was not individualized or tailored to the needs of H.A.; (2) by finding H.A. eligible for speech only; and (3) by predetermining H.A.'s IEP in advance of the IEP team meeting.  (# 11-1, pp. 68-69.)

15.  Hearing Officer Gerl summarized the violations in the case as follows:

> The violations in this case significantly impeded the right of the student's mother to participate in the decision-making process.  By predetermining the result of the student's IEP before the IEP meeting and by summarily

dismissing the input of the mother and her supervised psychologist and the child's physician and by ignoring the mother's pleas for one-on-one instruction, and by failing to reasonably and fairly assess all areas of suspected disability for this child, the schools have denied the mother any opportunity to participate in the IEP process.

Moreover, the violations by the schools have also caused a deprivation of educational benefits and a loss of FAPE for the student. By failing to address the clear needs of the student in social skills, behavior and communication, especially given her tendency to shut down or withdraw when frustrated or upset, the schools have clearly ignored the student's educational needs. Even after her second year of kindergarten, the student had failed to master nearly forty percent of the areas graded. Her report card for school year 2006-2007 notes that she has difficulty taking turns and being around others and that she needs to work on sharing and on being more independent. Thus, it is clear that even after repeating kindergarten, she is not making educational progress.

(# 11-1, pp. 83-85.)

Hearing Officer Gerl explained that he would order a comprehensive psycho-educational evaluation of H.A. because LEA "failed to reasonably evaluate [H.A.'s] suspected disability." (# 11-1, p. 78.) Hearing Officer Gerl acknowledged that

[it] is true that the school submitted the matter to its school psychologist [Mr. de Gruyl]. However, he testified that the student shut down during the evaluation and his report, which was entered into evidence as an exhibit, indicated that she became frustrated easily and failed to complete several evaluation items. Although he refers to the report of the supervised psychologist in his report, he apparently disregarded its finding that this student tends to freeze or withdraw when in an uncomfortable situation. In addition, the school psychologist notes in his report that he altered standardized test procedures in conducting his evaluation. Thus, in drawing conclusions without permitting the student to finish tests, without

13

taking into account the student's disability, and in particular, her pronounced tendency to withdraw or freeze when uncomfortable, and because he altered standardized testing procedures, the school psychologist's evaluation was not administered in such a fashion that the assessment accurately reflected what it purported to measure.  See, 34 C.F.R. Section 300.304(c)(3); Policy 2419, Chapter 3, Section 4(B)(6).

(# 11-1, pp. 77-78.)  Thus, "[i]n view of the somewhat conflicting subsequent evaluations," Hearing Officer Gerl ordered a new and independent examination.  (# 11-1, pp. 78.)

16.  Hearing Officer Gerl awarded the following relief described below.

a. The schools shall pay for a comprehensive psycho-educational evaluation of the student.  (# 11-2, p. 1.)  The new evaluation was to have an emphasis "upon the student's educational needs and not on the label for her condition. *** [T]he new evaluator should be apprised of the student's tendency to shut down and its potential effects on prior testing results.  The new evaluator should also have copies of all existing evaluations and medical records of the student, as well as any relevant school records of the student and this Decision." (# 11-1, p. 85.)  The comprehensive evaluation should identify all education needs of the child.  (# 11-2, p. 3.)

b.  Counsel for the parties were instructed to agree on or before November 26, 2007, as to the identity of the evaluator. If they were unable to agree, counsel for the parent was to provide the names and addresses of three qualified evaluators to counsel

14

for the schools by the close of business on that date.  If the parties could not agree, counsel for the schools could then choose one of the three evaluators on or before December 3, 2007.  (# 11-2, pp. 1-2.)

c.  "Within two weeks of the receipt of the report, the student's IEP team shall convene and design an educational program that meets the student's educational needs."  (# 11-2, p. 3.)

d.  Hearing Officer Gerl awarded two hours per week of compensatory education for a period of fifteen months, in addition to normal school hours provided by a certified teacher of autism in a one-on-one setting.  "The compensatory education sessions should focus upon the student's tendency to shut down or withdraw in uncomfortable situations, upon any social or communication needs of the student or upon any behavioral issues which the student may be encountering."  (# 11-1, p. 87.)

e.  Hearing Officer Gerl denied Defendants' request for extended school year services and reimbursement for tutor services. (# 11, p. 87.)

f.  Within 100 days, LEA was to submit a written report to the West Virginia Department of Education, Office of Assessment and Accountability, documenting all steps taken to comply with this order.  (# 11-2, p. 4.)

C.  **Events after Hearing Officer Gerl's Decision.**

1.  By letter dated November 27, 2007, counsel for LEA wrote

15

to Monica A.'s counsel, Bridget Andrews Remish of Legal Aid, indicating that, in an attempt to agree on an evaluator, he had provided six names from which Monica A. could choose. Counsel for LEA wrote to confirm that the parties had agreed on Fred Jay Krieg, Ph.D. (# 11, p. 74.)

2. On December 28, 2007, and January 8, 2008, Fred Jay Krieg, Ph.D. examined H.A. for the purpose of determining "how best to help this child." (# 11-2, p. 83.)

3. Dr. Krieg was provided medical records by both LEA and Monica A. (# 11-2, p. 83.)

4. Dr. Krieg was advised that time was of the essence, but his report does not indicate he was told that H.A. has been observed to shut down when frustrated or upset and that this tendency may have affected previous assessments and evaluations. (# 11-2, p. 83.)

5. Dr. Krieg's report discredits the medical sources who diagnosed H.A. with Asperger's or as being Autistic. (# 11-2, pp. 84-87.) Dr. Krieg writes in his report that

> it hardly took anytime at all in this evaluation to see that Holly does not have Asperger's Syndrome nor is she Autistic as she depends on interactions with other people. She is much attuned to how people perceive her and very self-conscious about her inability to do 'school work.' She has very little judgment and insight about appropriate social behavior.

(# 11-3, p. 2.)

6. Dr. Krieg observed H.A. in the classroom setting on

16

January 8, 2008, and found that she did well in the classroom setting. "She has friends [and] interacts with others" and they were working on keeping H.A.'s thumb out of her mouth. (# 11-3, p. 84.)

7. Academically, H.A. has no reading fluency skills, difficulty decoding, and has difficulty learning sight words. Dr. Krieg explained that as of September 2007, new standards went into effect which give schools one year to place the Response to Intervention model into operation, a three tiered program (Tier I, Tier II and Tier III and what is known as "IPAP"). If the new program were in place, H.A. would be receiving Tier I and Tier II services because she receives 90 minutes of reading block and 30 minutes in a small group. Her speech is considered IPAP. Under the

> new policy that went into effect in September of 2007
> [and must be implemented by September 2008, H.A.] would
> not be learning disabled. If one uses the old law, which
> will be indicated below and the discrepancy formula for
> learning disabilities, she would be classified as
> learning disabled. If you look at the discrepancy model
> when it was administered a year ago, [H.A.] was not far
> enough behind at that point to be learning disabled on
> the discrepancy model. It is only now that she is older
> that she is far enough behind. As a result, although all
> of these services are in place, the question of whether
> or not she is learning disabled is to say the least, a
> matter of interpretation.

(# 11-3, p. 6.)

8. Dr. Krieg concluded that H.A. "does have some problems in receptive and expressive language and she continues to need speech

17

therapy. She does not need occupational therapy or physical therapy." (# 11-3, p. 17.) Dr. Krieg recommended against traditional special education and pointed out that under the new tiered system, H.A. was in an appropriate program.

9. Finally, he reiterated the following points:

> [H.A.] is not autistic but does have significant emotional problems. [H.A.] needs to be around peers and needs to be with other adults. She needs a multitude of those people in order to overcome her anxiety disorder. She should not need a one-one-one aid as that will only continue to make her more dependent. [H.A.] does well when she practices at home so there should be a great deal of effort on her mother's part with her work so that she comes into class prepared. When she is prepared she feels that she is very successful.

(# 11-3, p. 18.)

10. Dr. Krieg was paid $2,400.00 for conducting this examination. (# 11-3, p. 47.)

**D. West Virginia Department of Education Correspondence.**

1. On January 29, 2008, Monica A. wrote to the West Virginia Department of Education, Office of Assessment and Accountability and stated that

> [t]he attorneys for the school refused to choose any psychologist from our list saying that they had no way of knowing weather [sic] or not the child had previously seen the psychologist or not.

> My attorney is very new, this was her very first case ever, and against my judgment she went with a psychologist that the school wanted to use because she was concerned about time constraints and they could not reach an agreement. I let her know that I was not happy about this situation, but with much persistence on her part I gave in.

18

(# 11-3, p. 80.)  Monica A. goes on to describe difficulties with Dr. Krieg's examination. (# 11-3, p. 81.)

2.  On April 10, 2008, Monica A. wrote to the West Virginia Department of Education, Office of Assessment and Accountability and stated that she submitted three psychologists to LEA and

> [t]he first was turned down because she was not a licensed school psychologist.  The school had every right to turn this name down.  The next psychologist was a nationally licensed school psychologist, but she was turned down because she was out of state.  The last psychologist my attorney suggested, in this state and a licensed school psychologist was turned down on the grounds that the school did not know if the child had ever seen this psychologist before.  I feel that this was a violation as long as the psychologist meets the recognized qualifications they can not impose these restrictions.
>
> When it became clear that the school was not going to use one of our psychologists my attorney insisted that we use the schools.  I repeatedly voiced my objections, but my attorneys' [sic] insistence finally [won] me out.

(# 11-3, p. 87.)

3.  On April 24, 2008, the West Virginia Department of Education, Office of Assessment and Accountability wrote to Kathy S. Sibbett, Director of Special Education for Nicholas County Schools, and indicated it had reviewed documentation related to Hearing Officer Gerl's order and "determined this documentation is acceptable as verification that the order has been completed as per the Due Process Hearing Officer's decision."  (# 11-1, p. 11.)

4.  On September 11, 2008, Monica A. wrote the West Virginia Department of Education, Office of Assessment and Accountability

19

again outlining the reasons for her dissatisfaction with LEA's implementation of Hearing Officer Gerl's decision. (# 11-3, pp. 83-86.)

**E.** **Educational Records after Hearing Officer Gerl's Decision.**

1. On February 29, 2008, an IEP meeting was conducted. (11-2, pp. 6-16.) The IEP mentions H.A.'s mild speech and language delay. (# 11-2, p. 7.) H.A. was placed in a general education environment for 89% of the time and a special education environment for 11% of the time. (# 11-2, p. 13.) The IEP states that H.A. "plays well with the other children and is generally a happy little girl." (# 11-2, p. 8.) In Part VIII of the IEP, in answer to the question of whether the student's behavior impedes her learning or that of others, the answer is "no." (# 11-2, p. 12.)

2. The record contains a Notice of Individual Evaluation/Reevaluation Request from LEA dated September 19, 2008, requesting a functional behavioral assessment. Monica A. signed off on this request and also requested an evaluation of H.A.'s social skills. (# 11-2, 28.)

3. The Functional Behavioral Assessment was conducted on October 9, 2008. The referral source indicates "[p]arent request." (# 11-2, p. 56.) The Assessment indicated that H.A. had a history of low self-confidence, crying, sucking on her thumb, and difficulty socializing with peers, especially males. (# 11-2, p. 56.) The evaluators, the head of special education, H.A.'s teacher

and the school counselor, concluded that H.A.'s low self-confidence made it hard for her to be completely responsible for her behavior. She appeared to get upset when instructional material has not been previously introduced and she is unfamiliar with it.  H.A. required lots of encouragement and positive reinforcement to begin assigned task/assignment.  (# 11-2, p. 56.)  The evaluators recommended a token reward system.

4.  The record contains an IEP dated October 17, 2008. (# 11-2, pp. 30-40.)  There is some mention of behavioral problems in class, but no mention of the Functional Behavioral Assessment. (# 11-2, p. 33.)  H.A. was to spend 81% of her time in the general education environment and 19% of her time in special education with receipt of speech therapy.  (# 11-2, p. 38.)

5.  An IEP meeting was noticed for February 20, 2009, and Monica A. indicated she would not attend because social skills had not been placed in H.A.'s IEP.  (# 11-2, p. 42.)  At the IEP meeting on February 20, 2009, a notation indicates that the results of a School Social Behavior Skills evaluation completed by four different raters who rated social functioning levels was attached, and all were noted to be in the average range in all areas.  (# 11-2, p. 46.)  The IEP contains the following narrative about H.A.

> [H.A.] is a delightful 2nd grade student. [H.A.] enjoys chatting with her peers during non-instructional times.... She often plays with dolls or stuffed animals during recess .... She offers to help other students and share school supplies with them. [H.A.] does suck her thumb quite often which is not appropriate for her age.

21

> Behavior has much improved this year.  She appears to be more cooperative, willing to work, and displays less frustration.  She attempts all her work without crying or scribbling on her paper.  She is currently working on grade level material with her same age peers and progressing. [H.A.] can work independently if she feels comfortable with what she is working on.

(# 11-2, p. 47.)

6.  The IEP also contains this handwritten statement

> [H.A.] has had a BIP in place since 10/22/08 with great success.  She continues to have the BIP used in all academic settings.  [H.A.] has earned her reward each day, twice a day, for appropriate behavior.  The plan has been effective for her.  Her teacher reports that she interacts well at outside and inside recess at all times.  She uses appropriate age related play skills and behavior during instructured [sic] play time[.] Difficulties noted by afterschool tutor appear to be behavioral in nature.  BIP will be implemented at after school tutoring.

(# 11-2, p. 47.)

7.  H.A. was to spend 81% of her time in the general education environment and 19% of her time in special education with receipt of speech therapy.  (# 11-2, p. 52.)

8.  The Behavioral Plan is attached to the IEP and involves a "ticket" reward system for good behavior.  (# 11-2, p. 54.)  It indicates that it was "implemented 10/22/08."  (# 11-2, p. 54.)

9.  The record contains a variety of observations by H.A.'s teachers, counselors and other sources dated in 2008 and 2009, as well as disciplinary forms dated October 14, 2008, and March 3, 2009.  (# 11-2, pp. 64-87.)

**F.** **Current Hearing Decision dated October 22, 2009, Docket # D10-002.**

1. On July 14, 2009, Monica A. filed a due process complaint request complaining as follows:

> Refused to evaluate for unreasonable amount of time. Provided biased evaluations based on the school agenda, not the child's needs. Refused to let parent use evaluator of choice. Refused to consider evaluations done at private expense. Denied/delayed IEP services long after they were more than aware that the child needed certain services. Repeatedly punished child for having a disability long after they were aware that such disability existed.

(# 11, p. 7.)

2. On September 17, 2009, Hearing Officer Patrick Lane conducted an administrative hearing at which Defendants called eight witnesses and offered forty-four exhibits into evidence and LEA called four witnesses and offered twenty exhibits into evidence. (# 11-4, pp. 51-86; # 11-5, pp. 1-32; # 11-8, p. 32.)

3. In the current hearing decision, Hearing Officer Lane addressed the following issues:

a. Did LEA fail to comply with Officer Gerl's decision which ordered an independent educational evaluation by requiring the use of an evaluator who was not independent from LEA?

b. Did LEA deny H.A. FAPE by failing to include special education and related services in the IEP which would address the student's needs for behavioral, social and communication needs? (# 11-8, pp. 32-33.)

23

4.    Hearing Officer Lane's decision included the following pertinent background facts and findings:

a. Dr. Fred J. Krieg, a clinical and school psychologist, performed the independent evaluation ordered by Hearing Officer Gerl. (# 11-8, p. 33.)

b.  Dr. Krieg determined that H.A. did not have Autism, Asperger's or Pervasive Developmental Disorder, a finding inconsistent with conclusions and diagnoses of the majority of medical professionals who evaluated and/or treated H.A.  (# 11-8, p. 34.)

c.  Dr. Krieg was not called as a witness by LEA to explain his findings.  (# 11-8, p. 34.)

d.  The school counselor has not provided H.A. with any counseling services, but has been present at IEP meetings. (# 11-8, p. 34.)

e. H.A. was not given a behavior plan at the time of the February 29, 2008, IEP meeting.  (# 11-8, p. 34.)

f. H.A.'s IEP already contained speech and communication skills before the February 29, 2008, IEP meeting, but not social skills. (# 11-8, p. 34.)

g.  The school counselor was part of the team that performed the functional behavioral assessment on H.A.  (# 11-8, p. 34.)

h.  H.A. received a behavior assessment on October 9,

24

2008, which attributed H.A. with low self-confidence, crying, sucking on her thumb, and difficulty socializing with peers, especially males. (# 11-8, p. 34.)

i. The school counselor does not believe Monica A.'s complaint caused the meeting regarding H.A.'s social skills, which occurred three days later. (# 11-8, p. 34.)

j. The school counselor filled out a ratings scale regarding H.A.'s social skills evaluation, which was submitted to the special education coordinator. (# 11-8, p. 34.)

k. The school counselor observed "tremendous improvement" in H.A. throughout the 2008-2009 school year regarding social skills. (# 11-8, p. 35.)

l. H.A.'s IEP was not changed regarding speech therapy or communication after the previous hearing decision. (# 11-8, p. 35.)

m. The speech therapist is a member of H.A.'s IEP team and does not know why it took eleven months after the previous hearing officer ruled that H.A. was denied social communication behavioral needs, to perform a behavior assessment. (# 11-8, p. 35.)

n. The speech therapist has not observed any social skills deficits or behavioral problems relating to speech/language or hitting from H.A. (# 11-8, p. 35.)

o. The Director of Special Education believes that the

IEP team was adequately meeting H.A.'s needs.  (# 11-8, p. 36.)

p.  Dr. Krieg was paid $2,400 for his psychological evaluation.  (# 11-8, p. 36.)

q.  Lex de Gruyl was paid $250 for a psychological evaluation. (# 11-8, p. 36.)

r.  H.A.'s scores on the Dibble test improved from 24-25 words per minute to 64-65 words per minute during one school year, and H.A.'s second grade teacher found this to be considerable improvement.  (# 11-8, p. 36.)

s.  H.A.'s second grade teacher believes that a social skills assessment was performed at the same time as the functional behavior assessment that was performed in October 2008. (# 11-8, p. 36.)

t.  H.A.'s second grade teacher agreed that H.A. was sometimes aggressive, but not difficult to control.  (# 11-8, p. 36.)

u.  H.A.'s second grade teacher felt that the behavior plan was very effective for H.A.  (# 11-8, p. 36.)

v.  H.A.'s Grandmother was very put off by Dr. Krieg and his attitude toward Monica A.  (# 11-8, p. 37.)

w.  The incident where H.A. hit another student with a book was considered an accident by the principal. (# 11-8, p. 37.)

x.  All four people who conducted H.A.'s social skills evaluation worked at the school.  She was not evaluated outside of

the school or during a summer program.   (# 11-8, p. 37.)

   y.   School does not have a special program for children who have difficulty with social skills, but classroom teachers, special education teachers and any professionals are constantly teaching social skills.  (# 11-8, p. 37.)

   z.   H.A.'s third grade teacher has not noticed any behavioral problems and does not believe H.A. needs a special program for social skills, but has only had H.A. in her class for eleven days.  (# 11-8, pp. 37-38.)

 5.  Hearing Officer Lane determined that LEA failed to comply with the previous hearing decision's requirement of an independent evaluation.  (# 11-8, p. 39.)

 6.  Hearing Officer Lane further determined that LEA denied H.A. FAPE by failing to include special education and related services in the IEP which would address H.A.'s needs for behavioral, social and communication needs.  (# 11-8, p. 39.)

 7.  Hearing Officer Lane made the following finding regarding Dr. Krieg's evaluation:

> The issue of the independent evaluation is troubling at best.  In the previous HOD [hearing officer's decision], the Hearing Officer identified a propensity by the LEA to disregard evaluations with which it disagreed and to seek out evaluations with which it agreed.  *LEA-1.*  When choosing the evaluator, LEA offered Dr. Krieg and rejected all suggestions from Petitioner.  LEA forced Dr. Krieg upon Petitioner by default.   Dr. Krieg then evaluated the student and came to the conclusion that the student was not on the autism spectrum.   This is the precise position espoused by the LEA and rejected by the prior HOD.   It appears that LEA has attempted to

> circumvent the original HOD by finding an evaluator whose findings would be consistent with the LEA position that the student did not qualify for services. It is disappointing that LEA offered the Krieg report into evidence but did not call Dr. Krieg to defend his conclusions. The Krieg report is inconsistent with numerous other evaluations and is therefore not credible without further substantiation and corroboration by additional independent evaluations.
>
> It is clear that LEA failed to comply with the independent evaluation requirement of the prior HOD. LEA will again be Ordered to provide an independent evaluation. However, since the LEA has undertaken to interfere with the process of selecting the independent evaluator, the Petitioner will choose the evaluator.

(# 11-8, p. 40.)

8. Regarding compliance with Hearing Officer Gerl's decision related to social/communication needs and behavioral needs, Hearing Officer Lane found that LEA denied H.A. FAPE and did not modify the IEP to add services to remedy the deficiencies in social skills, behavior and communication. Instead, according to Hearing Officer Lane, LEA

> continued using the deficient IEP without modification for eleven months after the HOD was issued. When questioned on this point, LEA employees replied that communications and behavior were not affecting student's education. These replies ignored the numerous disciplinary actions taken and the student's continuing reluctance to communicate effectively as noted even by Dr. Krieg. There is no valid excuse for simply ignoring the needs of the student after being Ordered to take note of and remediate such needs.

(# 11-8, pp. 40-41 .)

9. Hearing Officer Lane ordered the following relief:

> a. Hearing Officer Lane ordered an independent

28

comprehensive psycho-educational evaluation of H.A. by a licensed clinical or school psychologist or psychiatrist to be chosen by Monica A., which evaluation should include a behavior assessment and social skills component.  Monica A. was to choose the evaluator and the cost was capped at $2,500. (# 11-8, p. 41.)

      b.  Within ten school days of receipt of the evaluation, the IEP team was to convene and modify H.A.'s IEP to address the educational needs identified in the evaluation report.  (# 11-8, p. 42.)

      c.  Hearing Officer Lane awarded two hours per week of compensatory education and related services in the areas of social/communication/behavior needs for a period of eleven months in addition to the original fifteen months which were ordered in the previous hearing officer's decision.  (# 11-8, p. 42.)

**Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A district court should enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

Stated differently, "[t]o prevail on a motion for summary judgment, [the moving party] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law." <u>Harleysville Mut. Ins. Co. v. Packer</u>, 60 F.3d 1116, 1119-20 (4th Cir. 1995) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  In determining whether a genuine issue of material fact has been raised, the court

> must construe all inferences in favor of the [nonmoving party].  If, however, the evidence is so one-sided that one party must prevail as a matter of law, we must affirm the grant of summary judgment in that party's favor.  The [nonmoving party] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another[.]"  To survive [the summary judgment] motion, the [nonmoving party] may not rest on their pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue.  [T]he "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]"

<u>Harleysville</u>, 60 F.3d at 1120 (citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>. 475 U.S. 574, 587 (1986) (citations omitted).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried.  If not, the

30

district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." Thompson Everett, Inc. v. National Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995).

**Standard of Review in an IDEA Case**

Pursuant to IDEA, "[a]ny party aggrieved by the findings and decision made" by the hearing officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The party challenging the administrative decision before this court bears the burden of proof. See Barnett v. Fairfax Cnty. Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991); CM ex rel. JM v. Board of Public Educ., 184 F. Supp.2d 466, 470 (W.D. N.C. 2002).

Regarding this court's obligation when an aggrieved party under the IDEA brings an action in federal court, our Court of Appeals, in Doyle v. Arlington Cnty. School. Bd., 953 F.2d 100, 103 (4th Cir. 1991), explained that "[g]enerally, in reviewing administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." Similarly, Chief Judge Goodwin, in Board of Educ. v. Michael M., 95

31

F. Supp.2d 600, 605 (S.D. W. Va. 2000), observed that:

> [t]his court must conduct an independent review of the administrative record; however, the Fourth Circuit requires courts to give deference to the findings of the administrative hearing officer and has held that "administrative findings in an IDEA case 'are entitled to be considered prima facie correct.'" <u>Hartmann v. Loudoun County Bd. of Educ.</u>, 118 F.3d 996, 1000-01 (4th Cir.), <u>cert. denied</u>, 522 U.S. 1046, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998) (quoting <u>Doyle v. Arlington County Sch. Bd.</u>, 953 F.2d 100, 105 (4th Cir.1991)).

## **Analysis**

### A.   **Burden of Proof**.

The court proposes that the presiding District Judge find that the hearing officer did not err in placing the burden of proof on LEA based on Policy 2419[1] and, even if the burden of proof should have been placed on Defendants at the administrative hearing pursuant to <u>Schaffer</u>, Defendants met their burden.

In <u>Schaffer v. Weast</u>, 546 U.S. 49, 56-62 (2005), the Supreme Court addressed the issue of placement of the burden of proof in an administrative hearing challenging an IEP.   In the underlying decision, our Court of Appeals had reversed and remanded a district court decision and concluded that the burden of persuasion should rest with the party seeking relief.   On appeal, the Supreme Court affirmed, holding that the burden of persuasion in an administrative hearing challenging an IEP is properly placed upon

_____

[1]   "Policy 2419" is the West Virginia Department of Education Policy 2419: Regulations for the Education of Exceptional Students, found at 126 C.S.R. § 16.

the party seeking relief, whether that is the disabled child or the

school district.

> However, in closing, the Court acknowledged that
>
> several States urge us to decide that States may, if they
> wish, override the default rule and put the burden always
> on the school district.   Several States have laws or
> regulations purporting to do so, as least under some
> circumstances.  See, *e.g.,* Minn.Stat. § 125A.091, subd.
> 16 (2004); Ala. Admin. Code Rule 290-8-9-.08(8)(c)(6)
> (Supp.2004); Alaska Admin. Code, tit. 4, §52.550(e)(9)
> (2003); Del.Code Ann., Tit. 14, §3140 (1999). Because no
> such law or regulation exists in Maryland, we need not
> decide this issue today. Justice BREYER contends that the
> allocation of the burden ought to be left *entirely* up to
> the States. But neither party made this argument before
> this Court or the courts below. We therefore decline to
> address it.
> We hold no more than we must to resolve the case at hand:
> The  burden  of  proof  in  an  administrative  hearing
> challenging an IEP is properly placed upon the party
> seeking relief. In this case, that party is Brian, as
> represented by his parents. But the rule applies with
> equal  effect  to  school  districts:  If  they  seek  to
> challenge an IEP, they will in turn bear the burden of
> persuasion before an ALJ. The judgment of the United
> States  Court  of  Appeals  for  the  Fourth  Circuit  is,
> therefore, affirmed.

Id. at 61-62.

Like  some  of  the  states  listed  above,  West  Virginia  has  a

regulation placing the burden of proof on the school personnel in

certain  circumstances.    Specifically,  126  C.S.R.  16  §  3(A)

addresses  the  filing  of  a  due  process  complaint  at  the

administrative level, and states that

> [t]he burden of proof as to the appropriateness of any
> proposed action, as to why more normalized placement
> could/could not adequately and appropriately service the
> individual's education needs, and as to the adequacy and
> appropriateness of any test or evaluation procedure, will

be upon the school personnel recommending the matter in contention.

The Court in Schaffer very explicitly indicates that it did not address the circumstance wherein a state has a law or regulation overriding the default rule and placing the burden on the school district.   Indeed, these are the very circumstances before the court in the instant matter; West Virginia has in place a regulation placing the burden on the school district in specific situations, which apply in the instant matter.   If and until our Court of Appeals instructs otherwise, the placement of the burden on the school as expressed in 126 C.S.R. 16 § 3(A) overrides the default rule expressed in Schaffer.

In this matter, Hearing Officer Lane gave LEA the opportunity to call witnesses, and LEA did so.   (# 11-4, p. 51.)   Hearing Officer Lane noted in his decision that LEA called four witnesses and offered twenty exhibits into evidence.   (#11-8, p. 32.)   LEA had every opportunity to present its case.

Even if the burden should have been upon Defendants at the administrative level, as challengers of LEA's actions, Defendants offered extensive evidence at the hearing and showed that LEA failed to comply with the previous hearing decision related to an independent examination and to the inclusion of special education and related services in the IEP, which would address H.A.'s needs for behavioral, social and communication needs.

Thus, the court proposes that the presiding District Judge

34

find that Hearing Officer Lane's placement of the burden of proof on LEA was proper and must be upheld.

**B.** **Dr. Krieg's Examination.**

The court proposes that the presiding District Judge find that Hearing Officer Lane's decision that LEA did not comply with Hearing Officer Gerl's decision requiring an independent examination is supported by a preponderance of the evidence and entitled to due weight.

Monica A. asserted at the administrative level that LEA forced her to acquiesce to the use of Dr. Krieg because other evaluators were too expensive.  The result, according to Defendants, was that Dr. Krieg, an evaluator who had a relationship with LEA, was chosen and was not independent.

Hearing Officer Lane found in his decision that LEA attempted to comply with Hearing Officer Gerl's decision in that it arranged and paid for an independent evaluation by Dr. Krieg.  However, Dr. Krieg's results are inconsistent with the prior diagnosis and, he was not called as a witness to explain how he reached a different conclusion.  "Therefore, the evaluation and its conclusions are suspect." (# 11-8, p. 39.)  Hearing Officer Lane went on to find that "[g]iven the LEA's propensity to discredit [diagnoses] with which it disagrees and to seek out [diagnoses] with which it agrees, the outlying rejection of [an] autism spectrum diagnosis by Dr. Krieg brings into question the independence of the evaluation

35

itself." (# 11-8, p. 39.)

LEA first asserts that it complied with Hearing Officer Gerl's decision requiring an independent evaluation of H.A. using an evaluator agreed upon by the parties. According to LEA, although Defendants assert that the evaluation was not independent, they offer "no proof of a *quid pro quo* relationship," and point out that Hearing Officer Lane "found that Dr. Krieg was neither bound by any informal agreements nor requested to reach any specific conclusions." (# 13, p. 13.) In light of Hearing Officer Lane's finding (# 11-8, p. 37), LEA asserts that Defendants' claim and Hearing Officer Lane's finding that the examination was not independent fails.

LEA further asserts that Hearing Officer Lane's conclusion that LEA had a propensity to discredit a diagnosis with which it disagreed

> is unsupported by any evidence in the record .... It is incongruous for the [Hearing Officer] to conclude on one hand that the LEA failed to comply with the mandate that it cooperate to secure an independent comprehensive psycho-educational evaluation (and by implication consider the report's substance), and fault the LEA for considering the findings and recommendations contained in the independent comprehensive psycho-educational report on the other.

(# 13, p. 14.) LEA argues the Hearing Officer made a large and unfounded leap in concluding that because "Dr. Krieg was paid by the LEA and reached a different conclusion than other evaluators[,] his opinions are biased and suspect." (# 13, p. 14.)

Hearing Officer Lane did find that Dr. Krieg "was not bound by any informal agreements" nor was he requested to "reach any specific conclusions." (# 11-8, p. 37.)   In addition, he found that Dr. Krieg was provided the information required to evaluate H.A., as directed by Hearing Officer Gerl. (# 11-8, p. 37.)   The Hearing Officer did not find Dr. Krieg's report suspect because of a *quid pro quo* relationship.   Instead, Hearing Officer Lane noted the finding of Hearing Officer Gerl of a propensity by LEA to disregard evaluations with which it disagreed and to seek out evaluations with which it agreed.

Hearing Officer Lane found that

> [w]hen choosing the evaluator, LEA offered Dr. Krieg and rejected all suggestions from Petitioner. LEA forced Dr. Krieg upon Petitioner by default.   Dr. Krieg then evaluated the student and came to the conclusion that the student was not on the autism spectrum.   This is the precise position espoused by the LEA and rejected by the prior [Hearing Officer].   It appears that LEA has attempted to circumvent the original [decision by Hearing Officer Gerl] by finding an evaluator whose findings would be consistent with the LEA position that the student did not qualify for services.   It is disappointing that LEA offered the Krieg report into evidence but did not call Dr. Krieg to defend his conclusions.   The Krieg report is inconsistent with numerous other evaluations and is therefore not credible without further substantiation and corroboration by additional independent evaluations.

(# 11-8, p. 40.)

Hearing Officer Gerl's decision makes very clear that the parties were to agree on an evaluator and, if unsuccessful, that LEA was to chose from the list of evaluators *provided by Monica A.*

(# 11-2, p. 1.)   While Monica A. concedes that she ultimately agreed to Dr. Krieg, she also offered evidence indicating that the parties initially did not agree and, as a result, she provided a list of three names that were rejected by LEA, and the parties could not reach agreement.   (# 11-3, p. 87.)   Instead of choosing from the list offered by Monica A. when agreement could not be reached, LEA offered a list of names from which Monica A. was to choose.   (# 11, p. 74.)   LEA offered no evidence contradicting Monica A.'s letter outlining this sequence of events that led to the "choosing" of Dr. Krieg as the evaluator.

Even the evidence offered by LEA, the November 27, 2007, letter from LEA's counsel, indicates that while Monica A.'s counsel ultimately agreed to Dr. Krieg, it was LEA who offered this name, not Monica A.  (# 11, p. 74.)  While LEA couches its provision of the names of evaluators as "an attempt to agree on an evaluator," the procedure simply does not comply with Hearing Officer Gerl's decision, and deprived Defendants of the right to a qualified evaluator of their choosing.  (# 11, p. 74.)

It is undisputed that LEA did not choose an evaluator from a list offered by Monica A., and Hearing Officer Lane's finding that LEA offered Dr. Krieg and rejected all suggestions from Monica A. is supported by a preponderance of the evidence and entitled to due weight.

Regarding Hearing Officer Lane's finding that LEA had a

propensity to disregard evaluations with which it disagreed and instead, sought evaluations with which it agreed, Hearing Officer Lane relied upon the extensive findings of Hearing Officer Gerl in his decision at Docket # 11-1, pp. 74-78, and cited above.  Hearing Officer Gerl was troubled by the outright rejection of H.A.'s diagnosis of Autism by the qualified supervised psychologist "because of gross stereotypes concerning a disability ...." (# 11-1, p. 76.)  The IEP had rejected Ms. Knight and Mr. Morrello's report and diagnosis of Autism and failed to seriously consider the comments of the parents and instead, adopted the report of Mr. de Gruyl, a school evaluator who had disregarded the fact that H.A. tended to freeze up and withdraw in uncomfortable situations and who had altered standardized test procedures in conducting his evaluation before concluding that H.A. did not fall on the Autism scale.  (# 11-1, pp. 77-78.)  Because of the circumstances surrounding Mr. de Gruyl's examination and the other conflicting subsequent evaluations, most of which placed H.A. somewhere on the Autism spectrum but had not been available to LEA, Hearing Officer Gerl ordered a new independent examination.  (# 11-1, p. 84.)

Against this backdrop, Dr. Krieg engaged in the very behavior warned against by Hearing Officer Gerl.  Hearing Officer Gerl specifically stated that "[t]he emphasis of the new evaluation ordered herein should be upon the student's educational needs and not on the label for her condition." (# 11-1, pp. 84-85.)  Yet, as

Hearing Officer Lane observed "Dr. Krieg then evaluated the student and came to the conclusion that the student was not on the autism spectrum.   This is the precise position espoused by the LEA and rejected by the prior [Hearing Officer]."  (# 11-8, p. 40.)   In fact, Dr. Krieg opined in his evaluation about the label for H.A.'s condition:

> The number one question that has led to some of the controversy in this evaluation is whether or not this child is Autistic or Asperger's Syndrome.   It is this examiner's opinion that after evaluating this child, watching her in the classroom, and reviewing all of the records that she is not any kind of Pervasive Developmental Disorder, not Autistic, and not Asperger's Syndrome.   Anyone who has made that diagnosis has been relying on the information provided by the mother, has not made any contact with the school, and has not seen [H.A.] interact with other children and adults.   This examiner is certain that this child does not have that diagnosis.

(# 11-3, p. 17.)   As noted above, under policy soon to be implemented, Dr. Krieg opined that H.A. did not qualify for services beyond speech therapy.   (# 11-3, p. 6.)

Hearing Officer Lane's conclusion that LEA attempted to circumvent the original Hearing Officer's decision by maneuvering for the designation of an evaluator whose findings would be consistent with its position that H.A. did not qualify for services is supported by a preponderance of the evidence and entitled to due weight.

Moreover, as Hearing Officer Lane points out, "[i]t is disappointing that LEA offered the Krieg report into evidence but

did not call Dr. Krieg to defend his conclusions.  The Krieg report is inconsistent with numerous other evaluations and is therefore not credible without further substantiation and corroboration by additional independent evaluations." (# 11-8, p. 40.)  LEA bore the burden of proof before Hearing Officer Lane, yet failed to offer what would be considered its key witness, the medical source who performed the evaluation ordered by the previous hearing officer and upon whose opinion further action by LEA was presumably based.  Without subjecting Dr. Krieg's testimony about his conclusions to cross-examination, and without providing an opportunity for the hearing officer to hear his testimony and evaluate his credibility, Hearing Officer Lane was justified in calling into question the independence of his evaluation, particularly when Dr. Krieg did not follow the instructions of Hearing Officer Gerl and rendered opinions that contravened the other medical evidence of record.

Finally, LEA relies on the West Virginia Department of Education, Office of Assessment and Accountability letter dated April 24, 2008, in which LEA was deemed to be compliant with Hearing Officer Gerl's decision.  LEA offers no support for its position that a finding by the West Virginia Department of Education somehow resolves this issue in LEA's favor.

Based on the above, the court proposes that the presiding District Judge find that Hearing Officer Lane's decision that LEA

41

did not comply with Hearing Officer Gerl's decision requiring an independent examination is supported by a preponderance of the evidence and entitled to due weight.

**C.  Provision of FAPE by evaluating H.A.'s behavioral, social and communication needs and modifying IEP.**

The court further proposes that the presiding District Judge find that Hearing Officer Lane's decision that LEA denied H.A. FAPE by failing to timely evaluate and include special education and related services in the IEP which would address her needs for behavioral, social and communication needs is supported by a preponderance of the evidence and entitled to due weight.

Defendants allege that LEA was ordered to include behavioral support and services related to social and communication needs in the IEP, yet LEA failed to add such services, including a behavior intervention plan, to the IEP.

LEA argues that H.A.'s behavioral, social and communication needs, to the extent they existed at all, were properly being met under the current IEP. LEA points to testimony from the school counselor, H.A.'s speech therapist, the Director of Special Education, H.A.'s second grade teacher and her third grade teacher, all of whom testified that there were no social or behavioral problems and that the current IEP was meeting H.A.'s needs. (# 13, p. 15; # 18, p. 1.)  LEA contends that Hearing Officer Lane's decision flies in the face of professional educators and the

42

compliance finding of the Office of Assessment and Accountability.

(# 13, p. 16.)  According to LEA,

> [t]he appropriateness of the Student's IEP should be judged on whether the LEA gave appropriate consideration to the ordered independent comprehensive psycho-educational evaluation and input by educators who were working with the Student on a daily basis.  The evidence contained in the record offers no basis for an award of compensatory services in the areas of social/communication/behavioral needs.  The IHO's order that the Student's IEP be adjusted to include social/communication/behavioral services in an evaluation yet to be performed is not only presumptuous, it provides a remedy without an apparent problem.

(# 13, p. 16.)

In his decision, Hearing Officer Lane found that LEA denied H.A. FAPE by not modifying the IEP to add services to remedy the deficiencies in social skills, behavior and communication. Instead, according to Hearing Officer Lane, LEA

> continued using the deficient IEP without modification for eleven months after the HOD was issued.  When questioned on this point, LEA employees replied that communications and behavior were not affecting student's education.  These replies ignored the numerous disciplinary actions taken and the student's continuing reluctance to communicate effectively as noted even by Dr. Krieg.  There is no valid excuse for simply ignoring the needs of the student after being Ordered to take note of and remediate such needs.

(# 11-8, pp. 40-41.)

LEA claims that it modified H.A.'s IEP after "observing and monitoring" H.A., even though she essentially did not need any modification of her IEP because her behavioral, social and communication needs were not a problem during this time.

43

Hearing Officer Gerl's decision was issued on November 14, 2007, and stated that LEA had ignored H.A.'s educational needs by failing to address social skills, behavior and communication needs. (# 11-1, p. 83.)  Hearing Officer Gerl awarded two hours per week of compensatory education for a period of fifteen months, which education "should focus upon the student's tendency to shut down or withdraw in uncomfortable situations, any other social or communication problems the student may be encountering, and any behavioral issues relevant to this student."  (# 11-1, p. 87.)

Despite this, there was no mention at the next IEP meeting of a behavioral assessment.  It was not until October of 2008, almost a year later, that the LEA administered a behavioral assessment. This occurred shortly after Monica A.'s September 11, 2008, complaint to the West Virginia Department of Education about implementation of Hearing Officer Gerl's decision. (# 11-2, p. 56; # 11-3, pp. 83-86.)  Even then, the behavioral assessment was completed by sources inside LEA.

While LEA attempts to explain away this delay with glowing reports of H.A.'s performance from the time of Hearing Officer Gerl's decision onward, thereby suggesting that any delay was harmless because H.A. had no behavioral or social problems, this does not excuse the fact that LEA did not comply with Hearing Officer Gerl's hearing decision in a timely manner.  In fact, H.A. was having behavioral problems, as evidence by the disciplinary

44

actions taken on October 15, 2008, and March 3, 2009. (# 11-2, pp. 64-87.)  In any event, without a timely evaluation, no one can fully ascertain what the behavioral and social needs of H.A. might have been during this time period.

It is for this reason, that Hearing Officer Lane's award of compensatory services in the areas of social/communication/behavioral needs is not unreasonable, as LEA argues.  (# 13, p. 16.)  LEA argues that H.A.'s IEP should not be adjusted to include social/communication/behavioral services based on an evaluation that has yet to be performed.  (# 13, p. 16.)

Hearing Officer Lane ordered an independent comprehensive psycho-educational evaluation that includes a behavior assessment and social skills component, among other things.  (# 11-8, p. 41.) In addition, Hearing Officer Lane awarded Defendants

> two hours per week of compensatory education and related services in the areas of social/communication/behavior needs for a period of eleven months in addition to the original fifteen months which were ordered by the prior HOD.  The additional eleven months of compensatory education and related services shall be provided in accordance with the standards identified in the prior HOD.

(# 11-8, p. 42.)

Because LEA did not comply with Hearing Officer Gerl's decision in evaluating H.A.'s behavioral needs for approximately eleven months, Hearing Officer Lane's decision to award compensatory services in social skills, behavior and communication needs is supported by a preponderance of the evidence and entitled

45

to due weight.

Again, LEA's reliance on the West Virginia Department of Education's finding of compliance is less than convincing, as noted above.

Based on the above, the court proposes that the presiding District Judge find that this second aspect of Hearing Officer Lane's decision is supported by a preponderance of the evidence and entitled to due weight.

**Recommendation**

Based on the above, it is respectfully recommended that the presiding District Judge **DENY** Plaintiff's Motion for Summary Judgment**,** and **AFFIRM** the decision of Hearing Officer Lane.

The court further proposes that the presiding District Judge **DENY as moot** Plaintiffs' Motion for Temporary Injunction.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections), and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made,

46

and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to Plaintiff's counsel of record and to mail a copy to Defendants.

February 1, 2011
Date

Mary E. Stanley
United States Magistrate Judge